**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SOUTH TEXAS MEDICAL CLINICS, P.A., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-4041 |
| | § | |
| CNA FINANCIAL CORP. | § | |
| a.k.a. CONTINENTAL CASUALTY | § | |
| COMPANY, d/b/a CNA | § | |
| CATASTROPHE OPERATIONS and | § | |
| VALLEY FORGE INSURANCE CO., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This dispute concerns civil authority coverage, a type of business interruption insurance. Such insurance generally compensates for business interruption losses that result when a covered event damages the insured's property. Civil authority coverage provides compensation for business interruption losses resulting when an civil authority enters an order that prevents access to the insured's property, not because that property is physically damaged, but because other property is damaged. Case law examines such coverage to civil authority orders that prevent access to property because of because of weather, disturbances of the peace and, most recently, terrorist attack.[1] This case arises from a civil authority order

---

[1]      *See, e.g.*, *United Airlines, Inc. v. Co. of the State of Penn.*, 439 F.3d 128 (2d Cir. 2006) (September 11, 2001 terrorist attacks); *Southern Hospitality, Inc. v. Zurich Am. Ins.*, 393 F.3d 1137 (10th Cir. 2004) (September 11, 2001 terrorist attacks); *Kean, Miller, Hawthorne, D'Armond*

requiring the evacuation of Wharton County, Texas from September 22 to September 24, 2005, because Hurricane Rita was projected to land in an area that included nearby Galveston, Texas.  The insured owned and operated several medical clinics, including three in Wharton County.  The three clinics in Wharton County and four clinics in the adjoining counties were closed while the evacuation order remained in effect.  The storm took a different path and Wharton County suffered no storm damage.  Neither the insured's property nor property nearby was damaged.  The insured sought business losses from the period covered by the evacuation order.  The insurer denied the claim.  The issue in this case is coverage under the civil authority coverage provision.

The insured has moved for partial summary judgment that the defendants – the insurer and an affiliated entity – breached the policy.  The insured has also moved for partial summary judgment on its claim that the defendants violated the Texas Insurance Code and the Deceptive Trade Practices Act (DTPA) by failing to explain the basis for the claim denial in writing and promptly.  Finally, the insured has moved for partial summary judgment dismissing the defendants' counterclaim for fees and costs on the basis that including the affiliated company in the litigation was groundless and in bad faith.  (Docket Entry No. 19). The defendants responded and cross-moved for summary judgment that the insured's claim

---

*McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711 (M.D. La. Aug. 29, 2007) (Hurricane Katrina); *Dixson Produce, LLC v. Nat'l Fire Ins. Co. of Hartford*, 99 P.3d 726 (Okla. Ct. App. 2004) (tornado); *Assurance Co. of Am. v. BBB Serv. Co., Inc.*, 593 S.E.2d 7 (Ga. Ct. App. 2003) (Hurricane Floyd); *Narricot Inds., Inc. v. Fireman's Fund Ins. Co.*, No. CIV. A. 01-4679, 2002 WL 31247972 (E.D. Pa. Sept. 30, 2002) (Hurricane Floyd); *Sloan v. Phoenix of Hartford Ins. Co.*, 207 N.W.2d 434 (Mich. Ct. App. 1973) (riots following Martin Luther King, Jr.'s assassination).

was not covered; that there were no extracontractual statutory violations; and that the counterclaim was meritorious.  (Docket Entry No. 23).

Based on the pleadings, the motions, the responses, and the applicable law, this court denies the insured's and grants the defendants' summary judgment motions as to coverage. This court finds that, as a matter of law, the civil authority provision did not cover the business interruption losses at issue. This court grants in part and denies in part the defendants' summary judgment motion as to extracontractual claims and grants the insured's summary judgment motion as to the defendants' counterclaim.   The reasons are explained below.

## I.    Background

The facts are largely undisputed.  (Docket Entry No. 15).  South Texas Medical Clinics, P.A., operates medical clinics.  Valley Forge Insurance Co. issued commercial package policy number 2051956443 to South Texas, covering three medical clinics in Wharton County, Texas and four clinics in surrounding counties.  The policy's effective dates were August 1, 2005 through August 1, 2006.  The policy included business interruption coverage, both "Standard" and "Civil Authority Interruption."  The coverage provisions were as follows:

### A.    COVERAGE [Standard Business Interruption]

> . . . We will pay the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."  The "suspension" must be caused by direct physical loss of or damage to property at premises that are described in the Declarations and for which a Business Income

Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

### 3.    Additional Coverages [Civil Authority Interruption]

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

(Docket Entry No. 23, Ex. A).

In September 2005, Hurricane Rita formed in the Atlantic.  As the hurricane entered the Gulf of Mexico, its center passed about 40 nautical miles south of Key West, Florida. The hurricane winds damaged property in the Florida Keys on September 20, 2005 and damaged offshore rigs in the Gulf of Mexico.  Judge John Murrile, the County Judge of Wharton County, tracked the storm and its projected path.  On September 22, 2005, Judge Murrile issued a Public Information Release ordering evacuation of Wharton County, effective "on September 22, 2005 at 6:00 a.m. through September 24, 2005 at 8:00 a.m." (Docket Entry No. 15, Ex. 2).

In his affidavit and deposition in this case, Judge Murrile testified that he relied on all the information he received about the likely path of the storm and its intensity in deciding to issue the evacuation order.  The information he received included that Hurricane Rita had damaged property in Florida and drilling platforms located offshore in the Gulf of Mexico when it was a Category 2 hurricane.  Judge Murrile also relied on reports from the National

Weather Service and the National Hurricane Center that the storm had become a Category 5 hurricane after it entered the Gulf of Mexico and that one of the projected landfall areas was near Galveston, Texas.  The projections included that if the storm did land near Galveston, there could be winds of up to 150 miles per hour for ten to twelve hours in the Wharton County area.  (Docket Entry No. 19, Ex. 9; Docket Entry No. 24, Ex. 19).

Although the evacuation order did not apply outside Wharton County, South Texas closed both its three Wharton County clinics and four clinics located in other counties on September 22, 23, and 24, 2005.  South Texas asserts that it closed its non-Wharton County facilities "because its database is located at and operated from its main office in Wharton." (Docket Entry No. 23 at 6).

Hurricane Rita made landfall near the Texas–Louisiana border on September 24, 2005, far from Galveston, Texas.  The hurricane did not damage any of the South Texas clinics or any nearby property.  On October 26, 2005, South Texas submitted a claim to Valley Forge under the civil authority coverage for approximately $185,000 in net revenue lost when the clinics were closed from September 22 to September 24, 2005.

In a December 14, 2005 letter, Robert G. Stupica, Director of Property Claims for CNA Catastrophic Operations, denied the South Texas claim.  The letter quoted the language from the South Texas policy defining "Covered Causes of Loss" and the civil authority provision and stated, "Valley Forge Insurance Company cannot provide payment for your Business Interruption loss for the above stated reasons."  (Docket Entry No. 15, Ex. 4).  The defendants assert that Valley Forge had previously discussed the basis for denying coverage

5

with both South Texas and its insurance broker.  (Docket Entry No. 23, Ex. B, Attachments 2 and 3).  The defendants also argue that after the written denial, Valley Forge provided a further explanation in a letter responding to South Texas's request for reconsideration.

South Texas sued CNA Financial Corp. in Texas state court, alleging breach of contract and breach of the duty good faith and fair dealing.  South Texas also alleged violations of two new sections of the Texas Insurance Code, § § 541.060(a)(3) and 542.056. Section 541.060(a)(3) includes in the definition of "unfair settlement practice" "failing to promptly provide to the policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim."  Section 541.151 provides a cause of action against insurers that violate this obligation.  Section 542.056 requires an insurer to notify a claimant in writing of the acceptance or rejection of a claim within 15 business days after the insurer has received the documentation necessary to determine coverage.[2]

---

[2]      Article 21.21 of the 1951 Texas Insurance Code is the statutory predecessor to Chapter 541 of the current code, which was passed in 2003 and became effective on April 1, 2005. Section 4 of Article 21.21 provided:

> The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
>
> . . .
>
> (10) Unfair Settlement Practices.  (a) Engaging in any of the following unfair settlement practices with respect to an insured or beneficiary:
>
> . . .

———————————

> (iv) failing to provide promptly to a
> policyholder a reasonable explanation
> fo the basis in the policy, in relation to
> the facts or applicable law, for the
> insurer's denial of a claim or for the
> offer of a compromise settlement of a
> claim; . . .

VATS INS. CODE, art. 21.21, § 4.  Section 16 of Article 21.21 provided a private cause of action for violations of section 4 of that article:

> (a) Any person who has sustained actual damages caused by
> another's engaging in an act or practice declared in Section 4 of this
> Article to be unfair methods of competition or unfair or deceptive
> acts or practices in the business of insurance . . . may maintain an
> action against the person or persons engaging in such acts or
> practices.

VATS INS. CODE, art. 21.21, § 16.  In the current code, Section 541.060 replicates much of the language found in section 4 of article 21.21:

> (a) It is an unfair method of competition or an unfair or deceptive act
> or practice in the business of insurance to engage in the following
> unfair settlement practices with respect to a claim by an insured or
> beneficiary:
>
> . . .
>
> > (3) failing to promptly provide to a policyholder a
> > reasonable explanation of the basis in the policy, in
> > relation to the facts or applicable law, for the insurer's
> > denial of a claim or offer of a compromise settlement
> > for a claim; . . .

TEX. INS. CODE § 541.060.  Section 541.151 provides a private cause of action for violations of Chapter 541:

> A person who sustains actual damages may bring an action against
> another person for those damages caused by the other person
> engaging in an act or practice:
>
> > (1) defined by Subchapter B to be an unfair method of

7

CNA Financial timely removed to federal court.  (Docket Entry No. 1).  South Texas filed an amended complaint that added Valley Forge Insurance Company, the policy issuer, as a defendant.  (Docket Entry No. 9).  The defendants counterclaimed under section 541.153 of the Texas Insurance Code and section 17.50(c) of the Business & Commerce Code, which allow recovery of court costs and attorneys' fees if an action is "groundless in fact or law or brought in bad faith, or brought for the purpose of harassment."  (Docket Entry No. 10).  The basis for the defendants' counterclaim was South Texas's inclusion of CNA Financial in the suit and refusal to dismiss CNA Financial even after the policy issuer was made a defendant.

The parties conducted discovery and filed stipulations of fact.  The parties agree that Judge Murrile's Public Information Release constituted an "action of civil authority that prohibits access to the described premises."  The parties agree that Hurricane Rita is a "Covered Cause of Loss" and that South Texas's three Wharton County facilities are "described premises" under the policy's civil authority provision. The parties agree that by

---

competition or an unfair or deceptive act or practice
in the business of insurance; . . .

TEX. INS. CODE § 541.151.

In addition, Chapter 542 of the current code contains many of the same provisions as Article 21.55 of the 1951 Texas Insurance Code.  Both section 541.056 of the current code and section 3(a) of Article 21.55 require insurers to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss."  TEX. INS. CODE § 541.056, VATS INS. CODE, art. 21.55, § 3(a).

damaging property in Florida and oil rigs in the Gulf of Mexico, Hurricane Rita caused "direct physical loss of or damage to property, other than at the described premises." (Docket Entry No. 15).

The parties dispute whether the civil authority provision covers South Texas's business income losses arising out of the mandatory evacuation of Wharton County. The dispute focuses on the policy language stating that the civil authority order must be one that "prohibits access to the described premises *due to* direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss" (emphasis added). South Texas argues that the "due to" causation requirement is met because one of the reasons Judge Murrile ordered the mandatory evacuation of Wharton County was that Hurricane Rita had caused property damage in Florida. The defendants respond that the "due to" standard requires a more direct causal link between the damage to other property and the civil authority order. The defendants argue that Judge Murrile ordered the mandatory evacuation of Wharton County "as a precaution in advance of any anticipated damage to properties in Wharton County," not "due to" the hurricane damage to property in Florida and offshore. (Docket Entry No. 23 at 6).

The parties also dispute the application of the civil authority coverage to the four clinics located outside Wharton County. South Texas asserts that it had to close these facilities when it closed the main Wharton County clinic because the database for all the clinics is located at and operated from the main clinic. The defendants respond that these

other clinics are not within the civil authority coverage because Judge Murrile's mandatory evacuation order prohibited access only to South Texas's Wharton County facilities.

The parties also dispute whether the defendants provided a timely and adequate written explanation for denying South Texas's claim as required by section 541.060(a)(3) of the Texas Insurance Code.  Finally, the parties dispute whether the defendants are entitled to costs and fees because South Texas sued, and refused to dismiss, CNA Financial, which is not the insurer and, according to the defendants, did not participate in the decision to deny the claim. The arguments are addressed below.

## II.     The Legal Standards

### A.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but

need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. ExxonMobil Corp*., 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial.'"  *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006)

(quoting *Celotex*, 477 U.S. at 322).

### B. Contract Interpretation

Under Texas law, insurance policies are generally controlled by the rules of

construction that are applicable to contracts.  *Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d

764, 767–68 (5th Cir.1995) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665

(Tex.1987)).  A court's primary concern is to give effect to the intentions of the parties as

expressed by the policy language.  *Cicciarella*, 66 F.3d at 768 (citing *Ideal Lease Service,*

*Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex.1983)).  "A contract is ambiguous only

'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one

meaning.'"  *Cicciarella*, 66 F.3d at 768 (quoting *Yancey v. Floyd West & Co.*, 755 S.W.2d

914, 917 (Tex. App.—Fort Worth 1988, writ denied)).  "The determination of whether terms

are ambiguous is a question of law."  *Cicciarella,* 66 F.3d at 768 (citing *Yancey*, 755 S.W.2d

at 917).  "When the terms of an insurance policy are unambiguous, a court may not vary

those terms."  *Amica Mutual Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir.1995) (citing

*Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965)).  "Ambiguous insurance

contracts, however, will be interpreted against the insurer."  *Tex. Dept. of Housing and*

*Community Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th Cir. 1995) (citing *Nat'l*

*Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 522, 555 (Tex. 1991)).

What a contract means, and whether a contract is ambiguous, are questions of law for

the court.  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  If a

12

contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). A court should construe an unambiguous contract according to the plain meaning of its express wording. *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). Unambiguous contracts are enforced as written. *Heritage*, 939 S.W.2d at 121. In this case, the parties do not assert ambiguity.

III.    **Coverage**

   A.    **The Summary Judgment Evidence on the Reasons for Issuing the Civil Authority Evacuation Order**

   The summary judgment evidence includes the information on which Judge Murrile relied in deciding to issue the order and his own affidavit and deposition description of the reasons for the decision. Judge Murrile stated that he ordered the mandatory evacuation of Wharton County, Texas on September 22, 2005, "due to" all the information he had, "including the reports and briefings issued by the National Weather Service and the National Hurricane Center; my conversation with the officials in the Houston branch of the National Hurricane Center; my knowledge that Rita had damaged property in Florida and the Gulf of Mexico; and the high probability that Rita would destroy property, including homes and county infrastructure needed for basic services, and cause significant personal injury and death to the citizens of Wharton County, Texas, if it made landfall near Galveston." (Docket Entry No. 19, Ex. 9, ¶ 7). Before ordering the evacuation, Judge Murrile knew that Hurricane Rita had been a Category 2 hurricane when it passed over Florida; that "Rita had

damaged property in Florida"; that it had become a Category 5 hurricane in the Gulf of Mexico; that its projected path included landfall near Galveston, Texas, with winds as high as 150 miles per hour for ten to twelve hours in Wharton County; and that "[a] hurricane of this magnitude that had already caused damage to property in Florida and the Gulf of Mexico could cause significant damage to persons and property in Wharton County, Texas." (*Id.*, Ex. 9, ¶¶ 4, 6). South Texas argues that the affidavit shows that Judge Murrile ordered the mandatory evacuation of Wharton County "due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss," as required by the civil authority coverage provision. (Docket Entry No. 23, Ex. A).

The defendants argue that although Judge Murrile quoted the policy language in his affidavit in stating that he ordered the evacuation "due to" the information he received, including the information about prior damage to Florida and offshore property, there is no coverage. The defendants emphasize that in his deposition, Judge Murrile made it clear that the damage to property in Florida and offshore was not a causal factor in his decision to order an evacuation of Wharton County, Texas. Judge Murrile agreed that if there had been no damage to Florida or offshore oil rigs from the hurricane, but it had grown to a Category 5 storm projected to hit Galveston, he would have ordered the evacuation. Judge Murrile testified in his deposition that "if [Hurricane Rita] was coming to Wharton County," he would have ordered an evacuation even "if it didn't hit any land at all." (Docket Entry No.

23, Ex. C at 19).[3]  The defendants argue that Judge Murrile's decision to evacuate was based on the anticipated threat of damage to Wharton County if the hurricane made landfall nearby. While Judge Murrile considered the fact that the hurricane had damaged property in Florida and offshore, that information was relevant only because it provided a basis for gauging the likely impact if the hurricane landed near Wharton County.  The prior damage to the property in Florida was one piece of information showing that the hurricane was strong and could do severe damage if it made landfall in or near Galveston, Texas.

The legal issue is whether this relationship between "damage to property, other than at the described premises" and the mandatory evacuation order is sufficient to find that the civil authority evacuation order issued "due to" Hurricane Rita's previous damage to property in Florida and offshore.

## B.    Analysis

The plaintiffs rely on *Assurance Co. of Am. v. BBB Serv. Co.*, 593 S.E.2d 7 (Ga. Ct. App. 2003), in which a Georgia court of appeals affirmed the trial court's finding of coverage

---

[3]The plaintiffs object to this deposition testimony as nonresponsive and speculative.  Counsel for the defendants asked Judge Murrile if he would "still issue an evacuation order, regardless of property damage in some other location," if Hurricane Rita "was directed towards Wharton County." Judge Murrile answered:

> I mean, if it was heading for Wharton County, you bet, sure.  I mean, what would be the difference if it went through Florida, if it went through Cuba, if it didn't hit any land at all?  If it was coming to Wharton County, you bet. That's my responsibility.

(Docket Entry No. 23, Ex. C at 19).  Judge Murrile's answer responded to the question.  Because South Texas has argued that the reasons for issuing the civil authority order are critical, cross-examination as to those reasons does not call for impermissible speculation.  South Texas's objections are overruled.

for lost business income due to a hurricane under a similar civil authority provision.  The

following civil authority provision was at issue:

> We will pay for the actual loss of 'business income' you sustain
> and necessary 'extra expense' caused by action of civil authority
> that prohibits access to your premises due to direct physical loss
> of or damage to property, other than at the 'covered premises,'
> caused by or resulting from any Covered Cause of Loss.

*BBB Service*, 593 S.E.2d at 7.  In a bench trial, a member of the Brevard County Policy

Group in charge of making emergency-weather decisions testified that the group advised the

chairman of the county commission to issue an evacuation order based on "the fact that the

storm had been causing damage in its path, the forecast that the storm was headed to Brevard

County, and the anticipated impact of the storm if it reached Brevard County."  *Id.* at 8.  The

trial court ruled in favor of coverage, "implicitly finding that a basis for the evacuation order

was actual damage to property other than the insured premises."  *Id.* at 8.  On appeal, the

*BBB Service* court found that the insured had presented evidence showing that "actual

damage to property other than the insured premises was a basis for the evacuation order" and

that the trial court's decision based on this evidence was not clearly erroneous.  *Id.* at 9.

The defendants acknowledge that the facts in *BBB Service* are similar to those in the

present case but urge that it is distinguishable or not persuasive.  Citing *Utica Nat'l Ins. Co.

of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198 (Tex. 2004), the defendants argue that under

Texas law, the words "due to" require "a more direct type of causation between the order of

civil authority and property damage" than the Georgia court applied in *BBB Service*. (Docket

Entry No. 23 at 5–6).  In *Utica*, the Texas Supreme Court interpreted an insurance policy

excluding coverage of some claims "due to" certain events and coverage for other claims "arising out of" certain events.  The court held that "due to" had a different meaning than "arising out of."  The court concluded that "arising out of" meant a loose "causal connection or relation," while "due to" "requires a more direct type of causation."  141 S.W.3d at 203.  The defendants argue that "due to" requires a closer causal relationship between the damage to other property and the civil authority order than the Georgia court required.

It is difficult to conclude that in *Utica*, the Texas Supreme Court issued a generally applicable definition of the causal relationship required by the words "due to" in an insurance policy.  The *Utica* court's determination that the phrase "due to" required a "more direct causal link" was based on a comparison to the phrase "arising out of" in the context of parallel exclusions in the disputed policy.  The court interpreted the two phrases "in the context of this policy."  *Utica*, 141 S.W.3d at 203.  *Utica* does, however, make clear that "due to" requires a close causal link.

The defendants also rely on *United Air Lines, Inc. v. Ins. Co. of State of Pa*, 439 F.3d 128 (2d Cir. 2006), in which the plaintiff airline sought to recover business losses resulting from the FAA's shut-down of Reagan National Airport following the September 11, 2001 terrorist attacks.[4]  The airline's policy provided:

---

[4]  The defendants also refer to *City of Chicago v. Factory Mut. Ins. Co.*, No. 02 C 7023, 2004 WL 549447 (N.D. Ill. Mar. 18, 2004).  In that case, the plaintiff city made a claim for business interruption losses it sustained during the FAA mandatory ground stop order after September 11, 2001.  The city invoked the "Ingress/Egress" provision of its insurance policy:

This policy will cover the Actual Loss Sustained by the Insured due to the necessary interruption of the Insured's business due to the prevention of ingress to or egress from the

17

> This section [insuring against loss resulting directly from the
> necessary interruption of business] is specifically extended to
> cover a situation when access to the Insured Locations is
> prohibited by order of civil authority as a direct result of damage
> to adjacent premises, not exceeding, however, two (2)
> consecutive weeks.

*United Air Lines*, 439 F.3d at 131.  The trial court found that the policy did not cover the

airline's business losses because the Pentagon, which suffered damage during the terrorist

attacks, was not "adjacent" to the airport.  This finding is not relevant to the present issues.

But the court went on to hold that even if the Pentagon were "adjacent" to the insured

property, the order closing the airport was not a "direct result" of the physical damage to the

Pentagon.  *See id.* at 130.  On appeal, the Second Circuit declined to resolve whether the

Pentagon was "adjacent" to the airport, instead focusing on whether the airport was shut

down "as a direct result of damage to" the Pentagon.  *Id.* at 134.  The court emphasized the

evidence showing that "[t]here was apparently a temporary halt of flights into and out of the

Airport on 9/11 before the Pentagon was struck."  *Id.* at 134.  In addition, a Department of

Transportation memorandum stated that the airport remained closed until October 4, 2001

---

Insured's property, whether or not the premises or property of the Insured shall have been
damaged, provided that such interruption must be a result of the physical damage of the type
insured against and not excluded by this policy, to the kind of property not excluded by this
policy.

2004 WL 549447, at *2.  The "kind of property" covered by the policy included "real property in which the
City has an insurable interest, 'or within 1,000 feet of such property.'"  *Id.* at *3.  The policy also included
an explicit exclusion provision that excluded "indirect or remote loss or damage."  *Id.* at *3.  Based on these
two provisions, the court found that the insurance policy had a "territorial limitation" and that the policy did
not cover the city's business losses because "the damage that indirectly caused the ingress and egress
prevention at the airports did not occur at or within 1,000 feet of the insured properties."  *Id.*  The civil
authority coverage at issue in this case did not contain a similar geographic limitation.

"[b]ecause of the location of [the Airport] and the airport's flightpaths that take aircraft near the White House, Pentagon, Capitol, and other facilities in the Nation's capital." *Id.* at 135. The airport reopened several weeks later "when it was able to comply with more rigorous safety standards." *Id.* Based on this record, the court found in its *de novo* review that the "interruption to United's business following the attacks was, therefore, not the 'direct result' of damage to adjacent premises." *Id.* The court reasoned that if the terrorists had not succeeded in attacking the Pentagon, but had instead damaged "some other similar property not very far from the Airport but clearly not 'adjacent' to it . . . it can hardly be doubted that the effect on subsequent flight operations generally, and the United operations at the Airport in particular, would have been virtually identical," especially "[i]n light of the hijacking of the other airplanes that morning and the successful attack on the World Trade Center." *Id.* at 135.

In *United Air Lines,* the court determined that if a civil authority order is "caused by fears of future attacks," not by the need to "repair, mitigate, or respond" to physical damage inflicted on property other than the insured's, there is no coverage. 439 F.3d at 135. There is no causal relationship between the physical damage to other property and the civil authority order. Although the civil authority coverage provision in *United Air Lines* required the civil authority order to be the "direct result" of damage to other property, and the policy at issue here requires the civil authority order to be "due to" the damage to other property, that distinction does not make *United Air Lines* inapplicable. The court's causation analysis in *United Air Lines* cannot be explained solely by the difference between "due to" or "direct

result of."  Rather, the court in *United Air Lines* held that when the civil authority order is caused by the fear of future harm to the area where the insured property is located, not by the actual physical damage inflicted on other property, there is no causal relationship between the civil authority order and the damage to other property, as required for coverage.

The Second Circuit's reasoning in *United Air Lines*, based on a *de novo* review of the evidence, is more consistent with other cases interpreting civil authority coverage provisions than is the *BBB Service* court's review of the trial court's decision under a "clearly erroneous" standard.  At least one other district court has required a direct nexus between the civil authority's action and the prohibition of access to the insured premises.  *See Syufy Enters. v. Home Ins. Co. of Indiana*, No. 94-0756, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995) (finding no civil authority coverage because city-wide curfews during riots were imposed to prevent potential looting, rioting, and resulting property damage, not because of damage to adjacent property).  The cases reflect that "[g]enerally, civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises *in the proximity* of the insured's property."  Clark Schirle, *Time Element Coverages in Business Interruption Insurance*, THE BRIEF, Fall 2007 at *38 (emphasis added).  *See, e.g.*, *Southern Hospitality, Inc. v. Zurich Am. Ins.*, 393 F.3d 1137 (10th Cir. 2004) (finding no coverage under the plaintiff hotel's civil authority policy because the FAA's order prohibiting airplanes from flying did not prohibit access to hotel operations); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-

770-C, 2007 WL 2489711 (M.D. La. Aug. 29, 2007) (finding no coverage under the plaintiff business's hotel civil authority policy because the recommendations by Baton Rouge officials to stay off the streets did not deny access to the business's premises); *Dixson Produce, LLC v. Nat'l Fire Ins. Co. of Hartford*, 99 P.3d 725 (Okla. Ct. App. 2004) (finding no civil authority coverage because although travel to the insured business was not as convenient as before a tornado struck, a civil authority did not prohibit access to the insured business); *730 Bienville Partners, Ltd. v. Assurance Co. of Am.*, No. Civ. A. 02-106, 2002 WL 31996014 (E.D. La. Sept. 30, 2002) (denying coverage under the plaintiff hotel's civil authority policy because the FAA's order prohibiting airplanes from flying did not prohibit access to the hotel).

When, as here, the only relevance of prior damage to other property in deciding whether to issue a civil authority order that would preclude access to the insured's property is to provide a basis for fearing future damage to the area where the insured property is located, the causal link between the prior damage and the civil authority order is missing. Requiring such a causal link between the prior damage and the action by a civil authority does not rewrite the parties' policy, but rather gives effect to the language it contains.  *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) ("We must also attempt to give effect to all contract provisions so that none will be rendered meaningless.") (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951)).

The order Judge Murrile issued requiring the evacuation of Wharton County was "due to" his fear that Hurricane Rita would strike nearby.  That fear was based in part on the fact that Hurricane Rita had previously damaged property thousands of miles to the east as it crossed Florida and entered the Gulf of Mexico.  But the order was not issued "due to" the actual physical damage that occurred in Florida and on oil rigs in the Gulf.  Although Judge Murrile stated in his affidavit that his decision to order a mandatory evacuation of Wharton County was due in part to the fact that Hurricane Rita had already damaged property in Florida and oil rigs in the Gulf of Mexico, his affidavit makes clear that the damage inflicted in Florida and in the Gulf was relevant only as a basis for anticipating the harm that could result if Hurricane Rita made landfall near Galveston.  (Docket Entry No. 19, Ex. 9, ¶¶ 6, 7). As Judge Murrile testified in his deposition, "if [Hurricane Rita] was coming to Wharton County," he would have ordered an evacuation even "if it didn't hit any land at all." (Docket Entry No. 23, Ex. C at 19).

The record shows that Judge Murrile's decision to evacuate was based on the anticipated threat of damage to Wharton County.  The only significance of the prior damage to property outside Wharton County was as an indication of the harm that could result if Hurricane Rita made landfall near Wharton County.  Judge Murrile's mandatory evacuation order was not "due to direct physical loss of or damage to property, other than at the described premises."  (Docket Entry No. 23, Ex. A).  Because the mandatory evacuation order for Wharton County was issued due to the anticipated threat of damage to the county and not due to property damage that had occurred in Florida and the Gulf of Mexico, South

22

Texas's business interruption losses are not covered by its policy with Valley Forge.  South Texas's motion for summary judgment as to the issue of the policy's coverage is denied.  The defendants' motion for summary judgment as to the issue of coverage is granted.

### B.    The Texas Insurance Code

South Texas alleges that the defendants engaged in unfair and deceptive trade practices under section 541.060(a)(3) of the Texas Insurance Code by failing "to promptly provide" South Texas a "reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim."  South Texas also alleges that the defendants failed to notify South Texas "in writing of the acceptance or rejection of a claim no later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss" under section 542.056(a) of the Texas Insurance Code.

South Texas cannot prevail on its section 542.056(a) claim.  To the extent that Chapter 542 creates a private cause of action, a claimant may recover only "[i]f an insurer *that is liable for a claim under an insurance policy* is not in compliance with this subchapter."  TEX. INS. CODE § 542.060 (emphasis added).  Because the defendants are not liable for South Texas's claim for business interruption losses arising out of the mandatory evacuation of Wharton County, they cannot be held liable for violating the 15-business-day notice provision of section 542.056.  This holding is consistent with the application of subsections 3(a) and (c) of Article 21.55, which are identical to subsections (a) and (c) of section 542.056 of the current code, in *Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex.

2005).  The Texas Supreme Court held that the insured's claim that the insurer had "violated sections 3(a) and 3(c) of Insurance Code article 21.55 is . . . negated by the lack of coverage."  *Id.*  "There can be no liability under article 21.55 if the insurance claim is not covered by the policy."  *Id.*; *see also Protective Life Ins. Co. v. Russell*, 119 S.W.3d 274, 286 (Tex. App.—Tyler 2003, no pet.) (listing the elements of an Article 21.55 claim as the following: (1) if a claim is made pursuant to an insurance policy, (2) the insurer is liable under the policy, and (3) the insurer is not in compliance with the requirements of article 21.55, the insurer shall be liable . . ."); VATS INS. CODE, art. 21.55 § 6 ("Damages.  Sec. 6. In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable . . . .").

Section 541.151 of the Texas Insurance Code permits "[a] person who sustains actual damages" to "bring an action against another person for damages caused by" unfair or deceptive acts or practices, as defined by section 541.060.  South Texas alleges a violation of the "reasonable explanation" provision of section 541.060(a)(3).  A lack of coverage under the insurance policy does not automatically bar recovery for a violation of section 541.060(a)(3).  Texas state courts and federal courts applying Texas law have recognized "extracontractual" claims based on unfair and deceptive trade practices that arise independently of any contractual duty the insurer owes the insured under the policy.  *See First Tex. Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1179 (5th Cir. 1992) (interpreting Article 21.21, the statutory predecessor to Chapter 541 of the current code, and finding that

"[b]ecause the obligations made enforceable by article 21.21 . . . are imposed independent of the duties under the policy itself . . . an insured [may] recover under article 21.21 even in the absence of policy coverage"); *see also Southstar Corp. v. St. Paul Surplus Lines Ins. Co.*, 42 S.W.3d 187 (Tex. App.—Corpus Christi 2001) (reversing the trial court's grant of summary judgment on the insured's misrepresentation claim because such a claim "did not concern non-performance of the insurance agreement and may be brought independent of the claim for breach of the duty to defend under the insurance agreement").[5] The Insurance Code does not explain what "actual damages" are sufficient to support a private cause of action under Chapter 541.[6] South Texas has not identified "actual damages" that it sustained as a result of the defendants' alleged failure to provide a timely and reasonable explanation for denying South Texas's business interruption claim. There is a fact issue as to whether the defendants promptly provided a reasonable explanation, "in relation to the facts or applicable law," for denying South Texas's claim. TEX. INS. CODE § 541.060(a)(3). Based on the

---

[5]       *Boyd* addressed only unfair trade practices claims that were predicated on bad faith. Both section 541.060 and its statutory predecessor, section 4 of Article 21.21, require good faith in attempting to effectuate a prompt, fair, and equitable settlement. TEX. INS. CODE § 541.060(a)(2); VATS INS. CODE, art. 21.21, § 4(10)(a)(ii). The *Boyd* court found that the insured's common-law bad-faith claims and the insured's claim for treble damages predicated on bad faith were "negated by the determination in the breach of contract claim that there was no coverage." *Boyd*, 177 S.W.3d at 922 (citing *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001)).

[6]       The Texas Supreme Court has held that "an insurer's unfair refusal to pay the insured's claim causes damages as a matter of law." *Vail v. Tex. Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988). Because the policy does not cover the business interruption losses South Texas sustained during the mandatory evacuation of Wharton County, the defendants did not wrongfully refuse to pay South Texas's claim and South Texas cannot recover actual damages based on the defendants' refusal to pay.

present record, it is unclear whether South Texas may recover for the defendants' alleged violation of section 541.060(a)(3).

South Texas's summary judgment motion as to the Texas Insurance Code violations is denied. The defendants' summary judgment motion is granted as to the section 542.056(a) claim and denied as to the section 541.060(a)(3) claim.

### C.    The Counterclaim

The defendants counterclaimed against South Texas under section 541.153(c) of the Texas Insurance Code and section 17.50(c) of the Texas Business & Commerce Code for bringing an action that was groundless and in bad faith or for the purpose of harassment. (Docket Entry No. 10 at 4). The basis for this counterclaim is "South Texas' claim against CNA Financial Corporation." (Docket Entry No. 19 at 15). South Texas moves for summary judgment dismissing the counterclaim. South Texas asserts that because "CNA's appears on the Policy and, more importantly, on Stupica's denial letter, South Texas' claim is not frivolous." (*Id.* at 15). South Texas points out that the Valley Forge insurance policy was printed on CNA letterhead, (Docket Entry No. 15, Ex. 1); that South Texas was provided a CNA form to submit its claim for business interruption losses, (Docket Entry No. 19, Ex. 11); and that the letter denying coverage came from Robert Stupica on letterhead identifying him as a representative of CNA Catastrophe Operations, (Docket Entry No. 15, Ex. 3).

The defendants respond that Valley Forge, the insurer, "alone owes any duties to Plaintiff." (Docket Entry No. 23 at 11). According to the defendants, "[t]here is no mention anywhere in Plaintiff's submitted evidence of 'CNA Financial Corp.'" (*Id.* at 11). Because

26

"[c]orporate entities are entitled to treatment as separate and distinct entities, each bearing its own liability," the defendants argue that South Texas's decision to sue CNA Financial and, more importantly, to retain CNA Financial in the suit after adding Valley Forge as a defendant is groundless or in bad faith and for the purpose of harassment.   (*Id.* at 11).

The Texas Supreme Court has held that the term "groundless" in section 17.50 of the Texas Business and Commerce Code "has the same meaning as 'groundless' under Rule 13 of the Texas Rules of Civil Procedure." *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989).   An action is "groundless" if it "has no basis in law or fact, and is not warranted by any good faith argument for extension, modification, or reversal of existing law." *Id.* at 637 (citing TEX. R. CIV. PRO. 13).   In determining whether an action is groundless, a court must consider whether "the totality of the tendered evidence demonstrates an arguable basis in fact and law for the [plaintiff's] claim." *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (1989).   A suit is brought in bad faith if it is "motivated by malicious or discriminatory purpose." *Riddick v. Quail Harbor Condominium Ass'n, Inc.*, 7 S.W.3d 663, 677 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

The present record is insufficient to allow this court to hold, as a matter of law, that South Texas lacked an arguable basis in law and fact to include or retain CNA Financial as a defendant in this case.   The record does show that, as a matter of law, the decision to sue CNA Financial initially was neither groundless nor in bad faith.   Many of the defendants' documents relating to the policy and the claim adjustment had CNA Financial's name.   The more difficult issue is whether South Texas had a reasonable, good faith basis for refusing

27

to dismiss CNA Financial as a defendant after it added Valley Forge, the insurer, as a named defendant. The present record is inadequate to allow this court to determine that this decision did, or did not, violate the statute. Although the defendants deny that CNA Financial was involved in the decision to deny coverage, it is unclear what the corporate relationship between CNA Financial and Valley Forge is or why many of the claim-adjustment documents in the record bear CNA's name or were produced by CNA employees. There is scant information as to the relationship between CNA Financial and Valley Forge with respect to the claim-adjustment work. Any costs or fees from refusing to dismiss CNA Financial would, however, be limited to those attributable to the continued involvement of CNA Financial as well as Valley Forge in the lawsuit.

South Texas's summary judgment motion as to the defendants' counterclaim is granted as to the claim that the initial decision to sue CNA Financial was groundless or in bad faith and denied as to the claim based on the refusal to dismiss CNA Financial after Valley Forge was added to the suit.

## III. Conclusion

The parties' cross-motions for summary judgment are denied in part and granted in part. A hearing is set for **February 21, 2008, at 8:30 a.m.**, to address the remaining issues in the case and set a schedule for resolving them.

SIGNED on February 15, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

28